My name is Tom Waldo. I'm the attorney for Southeast Alaska Conservation Council and the other plaintiffs. With me at the council table is my colleague, Eric Jorgensen, and I'm going to try to reserve about four minutes of my time for rebuttal. All right. Would you keep track of it, sir? Yes, I will. Thank you. This case presents a question of first impression because the Army interpretation of the Clean Water Act. The court issued a section 404 fill material permit to the Kensington Mine for the discharge of processed wastewater into a lake, notwithstanding an EPA new source performance standard that prohibits those discharges. In my argument today, I just want to cover two principal things. Maybe it does and maybe it doesn't. Isn't that the question we're here to answer? Well, certainly the plain language of the new source performance standard prohibits the discharge of processed... I think that's the language. The question is, does it apply, right? In other words, there seem to be two conflicting sets of regulations, right? The question is, which one should prevail? That's exactly right. What I'm going to address today, first, is what the language of the Clean Water Act says about that, focusing on sections 301, 306, 402, and 404. Second, the agency's interpretation of the Act as expressed in the 2002 fill rule... When you say the agency, which agency are you referring to? If you aren't near the microphone, I can't hear you. Okay. Have I not been standing close enough? You have until the very last answer. All right. I'm sorry. Let me start with the Clean Water Act. First of all, there is no ambiguity in the language of sections 301 or 306. They're perfectly clear. Section 301 is the cornerstone of the Clean Water Act, and it prohibits... It says that the discharge of any pollutant by any person shall be unlawful, except as in compliance with section 306 and other sections of the Clean Water Act. Section 306, in turn, says that it shall be unlawful to operate any new source in violation of an applicable new source performance standard. In 1982, ETA adopted a new source performance standard specifically applicable to mills that use the frost flotation process for the beneficiation of gold ore, which is the precise type of facility proposed for use at the Kensington Mine. In furtherance of a congressional goal of eliminating all discharges to the navigable waters by 1985, EPA adopted a zero discharge limitation, no discharge of processed wastewater to navigable waters. That was based on a review of mines across the country that concluded that these kinds of discharges are not necessary. The plain language of 301 and 306, together with the performance standard, simply prohibit the discharge that the Corps of Engineers purported to authorize here. And up until... Council, I have a question for you. We have a tenet of construction that is sometimes used that the more general is supplanted by a more specific or more particular statute. Is that interpretive aid available in this case? And if it is, which would be the more particular requirement? Well, I would say that the new source performance standard is the more particular. It prohibits the discharge of processed wastewater to navigable waters from mills that use the froth rotation process. It describes very specifically the precise type of facility at use in this case, whereas the fill material definition is merely a broad and general definition. Up until a couple of years ago, the Corps of Engineers would have refused to issue this permit, but they've recently adopted a new interpretation of the Clean Water Act. It's based on sections 402 and 404 of the Act. The agencies now argue that if a pollutant meets the agency's definition of fill material, then all it needs is a section 404 permit, and it's exempt from section 301, 306, and other provisions of the Clean Water Act. Now, there's nothing in section 402 or 404 that actually says that. It's an inference that they draw based on a comparison of the language of those two provisions. Section 402 says that permits have to be based upon the condition that discharges will comply with any applicable requirements of sections 301, 306, and other provisions. Section 404 does not contain comparable language, and on the basis of this difference, the defendants jump to the conclusion that fill material must be exempt from 301 and 306. The problem with that inference is that it directly contradicts the plain language of 301 and 306 themselves. On their face, those sections apply to the discharge of any pollutant and to the operator of any new source. There is no exception in that language for fill material. In the absence of an explicit exemption for fill material, the agencies are in practical effect asking for an implied exception. Under the case of United States v. Rutherford, where you have clearly delineated statutes like sections 301 and 306, you should only find an implied exception if it's needed to avoid an absurd result or a result contrary to the purposes of the Act, and neither of those considerations applies here. Could there be, if the agency wanted to do it, could the performance standard itself be altered to have something other than a zero tolerance? The EPA certainly has the power to amend its regulations if it reviewed them and determined that this regulation was, for whatever reason, no longer appropriate, but I certainly don't think that the facts exist at this time to warrant such a conclusion. The Clean Water Act requires that EPA adopt a zero discharge limitation if it's practicable, and EPA made a determination over 20 years ago that it was practicable. But in theoretical terms, if there were a determination that a standard was not appropriate, there's a different process that could be used to change that standard instead of using a different section. That's what I'm trying to figure out. I'm sorry. Well, if there were a determination that in these circumstances something greater than zero tolerance should be allowed, what I'm trying to figure out is whether there's some other procedure that the agency could have used to make that conclusion. Okay, you mean as applied to a specific mine like the Kensington Mine? The answer to that is no. It has to be a nationwide standard, and the Supreme Court has been very clear that looking at the plain language of Section 306 again in the DuPont case, that there are no exceptions to Section 306. So it's a nationwide standard, and they can't make an exception for one particular mine. Now, the defendants are certainly correct that you should assume that Congress wrote Sections 402 and 404 with this different language deliberately, but there's a perfectly good explanation for that difference that doesn't require finding the implied exception. And in fact, it's the interpretation that the agencies have historically followed, and that is that Congress simply didn't intend for the Corps of Engineers to issue 404 permits for discharges that are subject to effluent limitations and performance standards. This interpretation gives full effect to the language of all the relevant provisions, it avoids the need to find any implied exceptions, and it better fulfills the congressional purpose of eliminating discharges to the navigable waters. For these reasons, basic principles of statutory construction preclude the implied exception sought by the defendants in this case. Under Chevron, Congress has spoken clearly to the issue in this case, and it's not necessary to defer to the agency's interpretation of the Act. Nevertheless, 301 and 306 squarely prohibit it with no exceptions, and 402 and 404 can be interpreted in a way that avoids the need to imply any exceptions. So following those basic rules of statutory construction, there's a clear result here, and that is that the Corps cannot issue 404 permits for discharges subject to effluent limitations and performance standards. Now, how do you determine that this is a direct violation of the statutes without determining whether 404 or 402 apply? Well, we believe that 402, well, if you could permit this discharge, it would need to be under section 402 because section 402 has the mechanism to enforce performance standards and effluent limitations. Does 301A say that? 301A says that you have to comply with 301, 302, 306, et cetera, 402 and 404. You have to comply with all of those provisions, one of which is 306, which prohibits a violation of the new source performance standard, period, no exception for fill material. So we're not for that regulation? Would there be a violation of the statutory section? I'm sorry, Your Honor, which regulation? Without the regulation you were just talking about. New source performance standard? Yes. Oh, yeah. If there were no new source performance standard that were applicable to this discharge, then I know of no reason that it would not be permissible for the Corps to treat it as fill were it not for that particular regulation. Right, because it wouldn't be violating section 306. Section 306 is specifically named in 301A, and it's that, the presence of 306 in 301A that leads to the violation here. Well, it's the presence of 306 plus the regulation and purposes. That's exactly. So without that regulation, it is not a violation of the statute, right? I agree. That's correct. As far as I know, I think that's correct. Now, I said that you don't need to defer to the agency's interpretation here, but the agency's interpretation of the Clean Water Act, as expressed in the 2002 fill rule, actually reinforces the plain language interpretation of the Clean Water Act that I've been discussing. In the fill rule, the Corps of Engineers and EPA jointly adopted a very broad definition of fill material. It includes anything that raises the bottom elevation of a water body, which covers any discharges that have suspended solids. And EPA has adopted a lot of effluent limitations for sources that include suspended solids. So the question arose in this regulation, what you would do with a pollutant that both meets the definition of fill material and is subject to effluent limitations adopted by EPA? The rule itself doesn't address that question at all, but the agency's addressed it directly in the federal register notice adopted with the adoption of the final rule. And they stated squarely that discharges subject to effluent limitations would continue to be governed under section 402 of the Clean Water Act, consistent with the agency's longstanding practice. Now, the defendants point to other language in the rulemaking in which the agency said that any mining-related materials with the effect of fill would be treated as fill material. But even as to mining-related materials, the agency's clarified that if effluent limitations applied to the material, that the discharge would have to be regulated under section 402 rather than 404. That clarification occurs in the responses to public comments that the agency adopted in conjunction with the final rule. The explanation appears in the excerpts of record at page 277. It's in the second full paragraph on that page. And in that paragraph, the question was raised by commenters of whether mining overburden or mine tailings would be governed under section 402 or 404 of the Clean Water Act. The agency's first level response was the statement preferred by the defendants, that if it has the effect of fill, then it's fill material. But that statement was immediately followed by two further sentences, the first of which begins with nevertheless, and the second of which begins with moreover. The nevertheless sentence says that if EPA has adopted effluent limitations or has determined that effluent limitations apply to the material, then the effluent limitations will continue to govern. The moreover sentence says that processed water will continue to be regulated under section 402 with effluent limitations. The Kensington discharge comes under both the nevertheless sentence and the process wastewater discharge from a frost flotation mill governed by EPA effluent limitations. This is a clear statement of the agency's intent as applied to the specific circumstances of this case. This interpretation is dispositive of the agency's intent in adopting the regulation because it was issued in conjunction with their adoption of the final rule. And moreover, if you believe that there is significant ambiguity in the Clean Water Act itself as to what Congress intended in this regard, then this statement is also a reasonable interpretation of the act that is entitled to substantial deference under Chevron. In contrast, the 404 permit issued to the Kensington mine itself is not entitled to deference under Chevron because it was not adopted as a rule with the force of law and it contradicts what the agency said when they adopted the final rule that is entitled to deference. I was just wondering why you paused. You wanted to save four minutes. We're down to go over that. Yeah, I think I will reserve the remainder of my time for rebuttal. Thank you. May it please the Court, my name is John Starr representing the United States and I'll be taking 15 minutes and John Berghoff will be taking five minutes on behalf of interveners. When you say representing the United States, which agency? The Corps of Engineers is the defendant in this case, Your Honor. Well, and the Forest Service is too. The Forest Service is sort of on the periphery of this case. The real challenge here is to the decision by the Army Corps of Engineers to issue a section 404 permit. So in your representation, it's the Corps? That's correct, essentially, yes, Your Honor. And on that, the district court here correctly held that the discharge of Kensington mine tailings into impounded waters is regulated under section 404 and not under section 402. That result arises from the plain language of the permitting provisions themselves, section 404 and 402, and of the joint Army Corps EPA fill rule defining fill material. Counsel, let's assume that the affluent meet the definition of fill or rule 404, but that also is the subject of a specific performance standard for new sources under 301 and 306. Do you think that the rule of construction about more particular governance over the general has any application here? And if it does, which of those two is the more particular? Okay, two responses to that, Your Honor. First, just a clarification, the discharge here meets the definition of fill material. As part of the discharge, there is a component containing processed wastewater, which does meet the definition of processed wastewater. But I think you need to go back to the statute and not the regulations to determine the statutory construction issue here. And in that respect, section 404 governs the discharge of two pollutants only, dredge material and fill material, and 402 governs discharges of all other pollutants. In that respect, then, they each impose their own separate protective regime. You almost say that is a jurisdictional matter. It is a jurisdiction. That's what I wanted to clarify. Where does it say that? It's in the plain language of the provision. That's the dividing line. Of which provision? Section 404 and 402. And those provisions established as the dividing line between the Army Corps' jurisdiction under 404 and EPA's jurisdiction under 402. But EPA clearly has jurisdiction over the portion of the material that constitutes the water part that the national standards concern. Well, Your Honor, the statute regulates the discharges. And here you have to look at the effect of the whole discharge. It does not regulate components, particular components, and subdivide the discharge into components to have, say, two regulatory schemes imposed. Well, presumably, if the discharge itself could be separated into its part, as some substances can be, then theoretically they both could apply. Well, if, as part of the process, there was a separation out and two separate discharges, I think that would be the case. What do you do when a discharge has two components, one of which is under the jurisdiction of the EPA and its national performance standard, and one component of which is under the jurisdiction of the Corps? That is the problem that we have to figure out, it seems to me. It isn't really one thing or the other. What you do is what the Army Corps did here with EPA's concurrence, that this was the proper way to do it. You look at the effect of the discharge to determine whether it meets the definition of fill material. Here... Well, you say the EPA's concurrence. They didn't concur in the specifics of this comment, did they? Yes, they did, Your Honor. And if you look at the... There's a memorandum to that effect in the record. It's written by Diane Regas of EPA. It's in the structure. And that memorandum agreed with the Army Corps of Engineers here that the discharges here into an impoundment made specifically for that purpose fall within the definition of fill material and are regulated under 404, not 402. Now, this is the second part of this project. Any discharges from the impoundment itself back into the water drainage system are subject to 402. But that's after the settling process of the fill material here. And those subsequent discharges fall within 402. But EPA did absolutely concur here that the discharge of mine tailings specifically into an impoundment constructed for that purpose, not into open water, but into an impoundment, constitute fill material under the definition. That memo lays out the... When you say impoundment, you're just referring to the lake. That's correct, Your Honor, as impounded for the purpose of receiving the discharges here. But anything leaving the impoundment is subject to a 402 permit. And the Army Corps here, with the concurrence of the state of Alaska... Why would that make sense? The Clean Water Act is designed to prevent pollutants going into waters of the United States, navigable waters. This lake is the navigable water, isn't it? Yes, it is. It's a water of the United States. A discharge that kills all the fish and aquatic material in the lake, why wouldn't that, as a common sense matter, be a violation of the intent of the Clean Water Act? That's a very good question, Your Honor. And the answer here is the Army Corps, after extensive analysis, determined that the regulatory scheme under 404, known as the 404b1 guidelines, would be met. And the plaintiffs have not challenged that determination. So the questions you're asking go to EPA's determination here, which... That is not forced, I agree, because the appellants are contending that it should be resolved under 402 and not 404. That's correct, Your Honor. I just have a very hard time, as a matter of looking at it, to see how the Corps could, under their 404 guidelines, how could they have reached this conclusion, when they're supposed to look at fisheries and so forth, when it kills all the fish? Yes, Your Honor, there's a detailed record on that, and it does agree that anything in the lake will probably die off. It will be restored upon completion. All the tailings will be tapped over. There'll be new vegetation and the introduction of fish, and it will be at least the equivalent of what was there before. So it's okay under the Clean Water Act to kill all the fish and hope that sometime you can later reinstate the aquatic animals and fish and so forth that were there. Well, the questions you're asking go to the challenge to the EPA's determination. I know. I understand that, but it's just... The agency made a determination that, well, for example, around the discharge pipe, once you get away from that, there'll be no toxicity. Things will be covered up. There's no doubt about that, but... So under that EPA memo, it's okay to discharge waste stream and so forth into the lake, provided that when it later goes into the site creek, that then it would be re-evaluated by the NPDES permit under 402. In fact, that has been issued in this case, that anything leaving the impoundment will meet state water quality standards and degradation. So it's okay under the policy of the act to pollute the lake, which is a federal water, so long as you don't pollute something else, the creek. Well, again, I'm not trying to sound evasive here because that's not... They have not challenged that, but this brings up the dichotomy between 404 and 402. 402 applies a different protective regime. I'm sorry. 404 applies a different protective regime. It nowhere mentions 306. 402 does mention 306. It says discharges under that have to comply with 306. 404 takes a different route. It requires compliance with the EPA and which have to be applied by the Army Corps of Engineers in every case where there's a discharge of fill material. Now, those regulations are not necessarily in conflict with the location regulation here, but if you look at the 404B1 guidelines, they're at 40 CFR 230.10. Yeah, I'm looking at that and I see under E of that that for the purpose of construction of farm roads and forest roads and so forth, that they have to look at circulation patterns, chemical and biological characteristics of navigable water to assure that it isn't affecting adversely those waters. That's correct. If 306 and 301 were to be involved in there, wouldn't that mean that they would have to have the same compliance? It seems to me that if you're looking at it and it's only about farm roads, why wouldn't it make sense that there is no implied exception for everything else that can pollute the water through mainstreams? Well, again, I'm not trying to be invasive. What you're talking about really is the application of these guidelines to the facts here. Again, that was not challenged. I'll go back even further. I'm looking at the regulation and saying, if it makes sense in 1E- I'm sorry, which regulation? Well, the one we're talking about all the time. Okay, the 404B1 guidelines? Yeah, right. Under 404B1E, there are these requirements for all the roads and the overburden and so forth there to have to comply, but it's only for those roads. I can't see that it makes much sense to have an exception, an implied exception, that you argue for for everything else. Well, first of all, Your Honor, we don't view this as an implied exception. We view this as right in the permitting provisions themselves. The plaintiffs are asking you to look outside of the permitting provisions, but if you look at the permitting provisions, it says 402. Let's start with 404, dredged or fill material. The protective regime is the 404B1 guidelines. 402, all other pollutants except dredged or fill material, and the protective regime there includes 306. Well, doesn't the preamble make it pretty clear that waste streams are still the regulated under 402? No, it doesn't, Your Honor. The preamble talks about past practice, and the past practice of the Corps has been to regulate discharges of fill material, even of waste, if there is the effect of fill. And for that, you can look to the Fourth Circuit decision in Kentucky for the Commonwealth, which discusses the prior Army Corps of Engineers regulation of sort of one step again. Yes, Your Honor. Where you were talking about the difference between the impoundment area and the downstream area, and the fact that even in your view, the zero tolerance standard would apply to the downstream area. And as I read the record of decisions, it does contain some possibility that there will not be a zero, that they won't meet the zero tolerance requirement downstream. How does that affect our analysis? I don't think it affects it at all, Your Honor. It's quite clear. Both agencies agree that Section 402 applies to any discharge from the impoundment, and a 402 permit has been issued. It's been compliant. It's been concurred in by the State of Alaska. And nobody's challenged the issuance of the 402 permit here. So I don't think that affects the analysis here at all. Now, what I'd like to do is get to the provisions that the plaintiffs are talking about to distract from the plain language of the permitting provisions themselves. Congress could easily, in 404 itself, have stated that discharges of fill material are subject to 306. It does not do that. It does it in 402. It does not do that in 404. Instead, it applies the 404b1 guidelines. I might mention, too, that 402 mentions 306 in two other ways, too, but 404 does not. That is, in approving a State program, a delegated State program, EPA has to make sure that the State program will comply with 306. 404 does not say that in its State provisions. And finally, the same distinction is drawn in the compliance provisions of both. But anyway, getting to the language of outside of the permitting provisions, that is 301 and 306. And very briefly, because my co-counsel needs to speak here as well, but section 301 and particularly 301c, it says effluent limitations established pursuant to this section shall be applied to all point sources of discharge of plaintiffs in accordance with the provisions of this chapter. That means you have to look at other provisions of the chapter, including specifically the permitting provisions here. The second clause up there, except in compliance with a fairly lengthy list of provisions, it does mention 306. It mentions a whole bunch of other things, including 402 and 404. Under their interpretation of that word and in the second clause, that means you have to comply with every discharge has to comply with everything on that list. That would mean you have to comply with 404 and 402 for a given discharge. That interpretation just doesn't make sense. To avoid that, they use the phrase in 402 that says except as in compliance with 404. So they agree it's got to be one or the other. But they only use that phrase for one limited purpose, which is that one. They do not, then they ignore the rest of the language of 404 and 402, which sets up the different permitting schemes. So their interpretation of that word and on that laundry list does not make sense. It means every discharge has to comply with everything on that list. And that's just not the case. It doesn't make sense. They also argue that under our interpretation, Congress would have used the word or instead of and, meaning 306 or 404. But that doesn't make sense either. That means you could comply, a permittee could comply with 306 or a 402 permit, where a 402 permit involves things other than just the 306 standards. So that doesn't make sense either. The plain reading, the most logical, reasonable reading of that laundry list of provisions is that you must comply with those that apply to you. And to determine which apply to you, you look at those specific provisions themselves. And here our view is under plain language, 404 applies to two pollutants and a particular protective regime. 402 applies to all other pollutants and applies to this protective regime, 306 standards. I might add, Your Honor, I'm risking getting back into your question about the, you know, the application here of the guidelines. But if you look at the guidelines, there can be a zero discharge requirement for those also. If you look at section 230.10a, small a, it says no discharge of dredge or fill material shall be permitted if there's a practicable alternative to the proposed discharge that would have less adverse impact. So there can be a zero discharge requirement under the guidelines under 404. The agency determined here that there was not a practicable alternative that had less impact and that has not been challenged here. So I don't see that there's necessarily a conflict between the guidelines and the 306 reg here. Each stat, Congress elected in each provision to set up separate regulatory regimes and that worked here. The Corps applied those guidelines. EPA concurred that the fill rule applies to the tailings here and the 404b1 determination here. Yeah, but as I look at that, it's a preamble and it's the preamble that accompanied the actual regulation that were approved. The preamble to the fill rule? Yeah, the fill rule. It made a distinction on ER 194. Yes, Your Honor. It made a distinction between waste streams and fill material. And it have both waste streams and fill material. And if that's the case, that's not to be considered as fill material. It's a long paragraph and I didn't read it all. Yes, it is, Your Honor. There are a couple other things in that paragraph and I'll get to the distinction you're drawing. But among other things, it says EPA has never sought to regulate the discharge of fill material. It says in column three on that page that mining-related materials are generally regulated as fill material. Now, you're talking about it. It does make two general statements there. One as to when 402 applies and one as to when 404 applies. But the basic fundamental dividing line is examining whether the discharge has the effect of fill. And under the facts here, and that's a fact-dependent determination subject to agency expertise, you look at the particular discharge and its effect on the particular water body. And all we're saying here, we're not looking for a blanket rule out of this court. We're arguing that the discharge here of mine tailings, which will raise the bottom elevation of the lake by some 50 feet, in this particular water body, an impoundment created specifically for this purpose, is fill material. In fact, plaintiffs can see- No, he's not talking about particulars. He's talking about a rule. And they're saying that the rule doesn't apply as being fill material when you have discharges that are, in effect, If you read that carefully, and I don't have it in front of me, but those are broad statements. That pertain to this rule. Well, this rule defines fill material in a particular way. And that's what you have to look, first of all, at the plain language of the rule. And I think that's the end of it. That's dispositive itself. You don't even need to get to the end. You don't consider what they said in the federal register about the effect of it? Well, if you look, if you don't resolve this based on the plain language of the rule itself and look to the preamble, then that's very relevant. But that statement is just a broad, general statement. It's not saying that a discharge that has the effect of fill is nevertheless under three or under four. Where is fill defined? Fill is defined in the rule itself as material discharge which has the effect of with dry land. There's no exception in that rule for the kind of... But that's not a statutory definition. That's correct, Your Honor. The statute does not define it. It's a definition in the rule which the preamble says, well, we don't consider these things to be fill. Well, I'll have to... I don't have that specific language in front of me. But again, that language is limited to situations where the discharge itself would be of, say, a processed wastewater with very small suspended solid content. Here we don't have that. Well, here are 70% of it is water by volume and 30% of it is solid. Well, the district court found that it was 55% solids. But what's your... By weight. By weight. That's correct. By volume, it's 70% and 30%. But again, this is an agency determination. It's a fact-bound determination on how to apply the fill rule and what... Counsel, I have one other question. Yes, Your Honor. And that has to do with Section 404 itself. It a couple of times makes reference to effluent standards or prohibitions under Section 1317, which I think is Section 307, if I'm not mistaken. Is that true? Yeah, yes, it is, Your Honor. Okay. And I'm looking at the original regulations on which the plaintiffs rely regarding the new source national standard. And they list as part of their authority Section 307. So why doesn't 404, just on its face, incorporate any effluent restrictions that are promulgated in part under the authority of Section 307? Okay. Your Honor, I haven't thought of that question, but I'm looking at Section 404. And I see one reference to 307. Well, there's one in S-1, and there's another one in R, which is relevant here because that has to do with federal projects. Yes. But it's similarly says that it makes an exception for effluent standards or prohibitions under Section 1317 as not being given permission under Section 404. So I'm wondering why that isn't an indication that there's supposed to be a relationship between 404 and the effluent prohibition, as well as 402. Okay. Your Honor, I'm looking at F-1, and there's a very limited reference to Section 307 in there. That section that deals only with certain categories, which are non-prohibited discharges of dredged or fill material. And at the end of the list of those, it says it's not prohibited by or otherwise subject to regulation under this section. And then it says, or Section 301A or 402, and then the reference to Section 307. I think that's for very limited purposes here. You still have to look back to the plain wording back in 404A. I think that's just a very narrow reference to Section 307 in a very small context here. You still have to get back to 404A. Well, it seems to me, though, to create at least an ambiguity as to the congressional court that is placed on the effluent standards and prohibitions. But there's a, it seems like a cautionary note in 404 itself. Well, it's interesting that it doesn't mention Section 306, though, there as well. So even if it's cautionary, it's certainly not cautionary with respect to the provision upon which plaintiffs are relying here. So again, I think the plain language weighs in favor of the government's interpretation here under the permitting provisions themselves. And the provisions outside of the permitting provisions upon which plaintiffs rely do not get them to where they want to go. Even if we don't win on plain language, I think the agencies are entitled to deference here under the fill rule, the plain language of the fill rule. And there's a second level of deference here, as I mentioned earlier, the Diane Regas memo applies- That isn't the same deference, Elizabeth. It's not, Your Honor. It's a secondary level of deference applying the regulation to the specific facts here. But you're correct. Thank you. All right. The time is back to you, but we'll allow you to proceed and give appropriate other extension of time to the other side. Thank you, Your Honor. I'm going to excuse the Court. I'm going to turn it over to the Attorney for the Defendant Intervenor Corps, Alaska, who is developing this mine in southeast Alaska, close to Juneau. Let me try to address two or three questions which have been raised here because my time is exceedingly limited. First of all, Your Honor, with respect to your question, Judge Hugg, on the preamble, the preamble and the regulation itself squarely, squarely apply to this discharge, to the fill here. It, the definition of fill material, my co-counsel has already referred to. In the definition of discharge of fill material in the regulation, they refer specifically to the placement of tailings or similar mine-related materials. And I'm quoting. In the preamble, they say, quote, and this is on the ER-194, the language in today's final rule will clarify that any mining-related material that has the effect of fill when discharge will be regulated as fill material. Mining-related material. Specifically covered here, the mine tailings. Well, say all mining-related material. I mean, there's ore burden, which is distinct, is it not, from tailings? It is indeed. But tailings, Your Honor, have the effect of raising the level and therefore are specifically covered by this rule. And the plaintiff ... Well, I thought that in the portion that I was looking at that I only read a part, it said that wouldn't be filled if it comes from mainstream of water. If it comes from a waste stream as opposed to mine tailings, that would not be. But keep in mind here, too, and I think it's important to understand the overall situation here. This is in Southeast Alaska. This has been exhaustively studied by the Corps and by the EPA and by the Forest Service and the record built for both the 404 permit, particularly the 404B1 guidelines, is thousands of pages. They arrived after public hearings and opportunity for comment at the conclusion that in this area of the country, where the tailings were either going to have to be placed in wetlands and take wetlands forever. Was that ... Excuse me for interrupting, but was the 1977 or 8, wasn't that to be on dry land, the other alternative? But the wetlands had to be filled first and then the tailings placed upon the material which took the wetlands. And here, hundreds of acres of wetlands may have needed to have been taken under some of these alternatives. And exhaustively looking at this, the agency arrived at the conclusion that this lake would serve as the impoundment for these tailings for a period of 10 years. It will be reclaimed and there is a 402 permit for the discharge from this impoundment that meets the requirements, that meets the standard. There is already a 402? I'm sorry? You say there's already a 402 permit? Yes. From the impoundment? They say that at that point, they would have to look at it. No, that permit has been granted. It has not been challenged in this litigation. The appellants don't challenge it. And it is applied as a part of this overall project at that point because you have to settle out the tailings. They have to settle out. You cannot apply these kinds of effluent limitation guidelines to solid material. It doesn't make sense. And they never intended it for that purpose. That's why there are these two programs, 402 and 404. They are distinct programs. 306 applies and 301 apply within the 402 program. It's nonsensical from a technical position that it would apply in the 404 program. But the 404 program, Your Honor, is equally rigorous to 402. And Judge Graber, I think in terms of statutory interpretation and how this is looked at, it seems to me that this is much closer, Your Honor, to the decision in Defenders of Wildlife against Browner, a 1999 decision of this court, where here if Congress wanted 306 applied in the 404 program, all they had to do was say it. But it's not in there. The 404 program does not apply 306 because it doesn't make any sense technically to apply it to solid slurry such as this wet sand that is coming out and would be going into the impoundment. And legally, it's an entirely separate program. And the appellants agree with that. They do not dispute. In fact, they concede in their opening brief. These programs are separate and distinct. And they are. And they are for a reason, good reason. And we urge this court to affirm the granting of this permit. And I think, Your Honor, that I have run to the end of my time. And I greatly appreciate your willingness to hear that. And I also understand that you would like to address – well, the counsel has a reply. Yeah, but we will address the injunction later. You're right. I will be here to do that. All right. Thank you. Now, we have gone over for 14 minutes. So we'll give you an additional 17 minutes. I don't need that much, Your Honor. Thank you very much. I'll keep it shorter than that, I think, if you let me. Tom Waldo again for the plaintiffs. The first thing I'd like to address is both the question that Judge Graber was asking near the beginning of Athalee's argument and the point that Mr. Berghoff was making at the end about the nature of this discharge, how it's solid suspended in a liquid solution, a wastewater discharge. That was exactly the type of discharge that EPA described when it adopted the new source performance standard for froth flotation mills. It is not necessary to separate out and say, well, the Corps has jurisdiction over the solid part and the EPA has jurisdiction over the water part. That's not the way EPA addressed it. It was a wastewater discharge that by its very nature, because of the way these froth flotation mills work, it contains a very high component of suspended solids. When EPA adopted that new source performance standard, it was specifically with the intent and knowledge that it was governing the entire wastewater discharge, including all these suspended solids. That was a reasonable exercise of EPA's discretion and authority under the Clean Water Act. Now, if you interpreted the discharge at the Kensington Mine as fill material, because it has the effect of raising the bottom elevation, it renders that new source performance standard to be a complete nullity, because the discharge from froth flotation mills by its nature always contains these high levels of solids that will have the effect of fill, that will meet the definition of fill material, and under their interpretation, that regulation becomes completely superfluous. That's just an unacceptable interpretation. Another issue raised by the defendants was the Diane Regas memo adopted by EPA. As Judge Hugg pointed out, that is not entitled to the same level of deference as the fill rule, because it was merely an informal agency interpretation, an informal agency memo, rather than a rule adopted with the force of law. It also seems to hedge quite a bit, as I read it as to whether it's really looking at the facts or it's that this is theoretical and somebody still has to apply it to the facts. At least that's how it appears to me. Perhaps that's true, but to the extent that the memo suggests that the wastewater discharge from the Kensington Mine can be regulated as fill material and therefore be exempt from the new source performance standards, then it contradicts what the agency said when they adopted the fill rule. As between the fill rule and the Regas memo, the fill rule is entitled to the higher degree of deference. Mr. Starr cited the Fourth Circuit's decision in Kentuckians as an example of supporting the past practice of the court in regulating fill material. Of course, the important distinction between this case and Kentuckians is that the valley fills or mountaintop removal in Kentuckians were not subject to any effluent limitations. We have been pointing out from the beginning in this case that this was a substantial change in agency practice, that the court had never issued a permit like this before. The defendants have virtually scoured the country looking for an example to establish a precedent, and they haven't found a single one. Not one of the permits they cited as providing some sort of precedent actually authorized the discharge of, actually with a 404 permit, authorizing discharge of something subject to an effluent limitation or a performance standard. That's very strong evidence that what we are seeing now after the 2002 fill rule is a substantial change in agency practice that was not described in the 2002 fill rule. The final thing I would like to address is the interpretation of Section 301A and the fact that Section 306 is listed on there. Mr. Starr argued that it doesn't make sense to say that every discharge has to apply with all of those provisions, and yet that's exactly what the language says. Now he's clearly correct that some of those provisions just won't apply to some discharges. For example, if there's no new source performance standard, then 306 just doesn't apply. In this case, the question under 306 is whether there is a standard of performance applicable to the source. There is no question that the standard of performance for froth flotation mills is applicable to this source. It's a mill using the froth flotation process for the beneficiation of gold ore. It's clearly applicable, and if you accepted the defendant's argument that 306 only is applied through Section 402 and has no self-standing authority, then its presence in Section 301A would be completely superfluous. It wouldn't serve any purpose there because it would be included within Section 402. The fact that 306 is listed in that section shows that Congress intended that that section has separate meaning and that it applies to the discharge of any pollutant. It applies here, and it prohibits the discharge that EPA has authorized in the Kensington Permit. The Court has no further questions. Do you agree with opposing counsel on the interpretation of the preamble that I was questioning, Bob? No, I certainly do not. The preamble states that, as I discussed in my argument, that discharges subject to effluent limitations would continue to be regulated under Section 402 consistent with the agency's longstanding practice. As I also discussed in my argument, Mr. Berghoff made reference to the statements about how materials would be treated as fill material if it had the effect of fill, but even that statement was qualified in the responses to comments when the question came up, how does it relate to effluent limitations? That statement I read from, I think it was ER 277, addresses that issue directly, that even for mining-related materials with the effect of fill, if there's an effluent limitation applicable to it, as there is in this case, then the effluent limitation controls and has to be permitted through Section 402, if at all. Thank you very much. Thanks, counsel. The case just heard will be submitted, and we'll now proceed to the discussion of the injunction. Yes. Your speaking is set aside, so we'll hear from you first. Thank you, Your Honor. Judge Graber, it's John Berghoff again. On behalf of CORE Alaska, we have moved for a lifting of the injunction pending appeal, and the co-counsel for the Department of Justice has agreed with that motion. The basis for our motion to lift the appeal, the basees are rooted to. First, the impact of the Purcell Supreme Court decision, which came down in late October. Counsel, I assume by your argument under Purcell that what you're saying is that the motions panel that considered this previously did not issue a decision that contained full reasoning in the manner that Purcell appears to contemplate. But our panel can't do that, so isn't that a fixable problem by us if we were to issue a continuation that contains full reasoning? Your Honor, the problem with a kind of fix, if you will, in this situation is the second reason we are asking for this injunction to be lifted, and that is the unusually heavy precipitation which has taken place in the Southeast Alaska area in the last few months, which has put the stability of this impoundment in jeopardy. Well, why isn't there a complete answer in the injunction itself that permits essentially emergency measures to be taken in response to emergency conditions? Your Honor, I wish it was that clear. But without findings, number one, we are having difficulty, frankly, interpreting this proviso, which at best is vague because the proviso... But my point is, if we said, and I'm speaking only hypothetically here, obviously our panel has made no decision, but if we were to make complete findings and say, you can fix it if you've got a problem from the rain, why isn't that a complete answer? If we were allowed, Your Honor, to move forward under the approved engineered plan, which would mean the construction of the earthen, and it's an earthen phase one dam at that site, so that we could stabilize it, yes, that would be... How big is a temporary one now? A temporary one is hardly a dam. It is referred to in the motions as a cofferdam, Your Honor, but I've seen it, and it's simply the push-up of construction dirt that is hardly... How high? How high? Probably about 10, 12 feet, and that's all. What effect would the rain have? The primary concern of the effect with the rain would be the washing of excess sediment into Lower Slate Creek, and that would be in excess, for example, of the 402 permit requirements that are in place there at the base of the lake impoundment, and we are concerned. Keep in mind, there are no tailings, of course, going into the lake at this stage, and this is a process, by the way, that does not use cyanide or any such toxic materials, but we are concerned about the overflow of sediment into Lower Slate Creek. Why can't that 10 feet's worth of dirt be moved? Moved in what sense? We're afraid it will be moved out by the water rushing in. I think the question is, if it's that small, why can't it just be removed until the litigation is concluded? Because it is basically an impoundment at this stage of the game, Your Honor. Construction has been ongoing until the August injunction was issued. Construction has been ongoing, consistent with the permit, consistent with the approved plan by... What kind of construction? What kind of construction? Basically, this is fault number one, increasing the area around the lake, so as the lake rises and the surface acreage increases, that can be accomplished. Secondly, there is also a water diversion, which would be insufficient to handle extremely heavy rains. There is a water diversion, which is permitted, that goes around the east side of the lake. Does that then solve the rain? Yes, it does. Mr. Berghoff, at least insofar as your motion is predicated on the failure of this injunction pending appeal to comply with the Purcell requirement, I'll call it, isn't your challenge untimely because your remedy was to petition for cert as the Purcell petitioners did? Theoretically, we could have petitioned for cert as well, Your Honor. Theoretically? Practically, you could. Practically, we could have at that stage of the game. We did not anticipate that we would have the second ingredient coming into play here, Your Honor, which were the excessive rains, and the proviso here has been vague and difficult for us to adequately interpret, and frankly, we did not want to proceed in a way that would be of concern with respect to the way that proviso in the present injunction is worded. That's the sum and substance of our concerns. We frankly did not anticipate this second element, Your Honor, and that is the excessive rains in southeast Alaska. And we have offered, by the way, to the appellants to visit the site with us. We have not been able to get that accomplished. No one's fault. The water continues to be a factor in all of these considerations. It's curious to me, we have the reinstated permit was March 29th, 2006. The amended complaint was filed just a few days afterwards on April 3rd of 2006. At what stage was this earthen temporary dam constructed? Well, this has been ongoing, and that was constructed earlier this year, Your Honor, in the spring. I don't know precisely whether it was before or after March, but it was in the spring of this year. Wouldn't normally, when you figure that there's all this being contested, that if you go ahead and start putting some of the construction in, particularly this earthen material that you're worried about, that you're doing it at your own risk? There's no question we were, Your Honor. We understood that, and we were frankly confident, still confident, that this permit will be at the base of the impoundment. We're still comfortable with that. We are confident of that. And secondly, most importantly, Your Honor, this can be all reclaimed. Nothing has been done. In other words, nothing has been done in construction that cannot be reclaimed. Now, if you were, if the injunction were removed, what would CORE be doing? As soon as we could, Your Honor, given the weather conditions, it is now frozen. But that can change quickly in Juneau. It can start raining on the snow, which is what we're concerned about. As soon as possible, we would move forward with construction of the earthen phase one dam, which is roughly 38 feet in height. And again, it's an earthen dam. The plaintiffs make this out to be as if it's the Hoover Dam. Is that the eventual height? No, the full height will be 90 feet. But we are convinced that this will be sufficient to stabilize the site. So you would be proceeding to 38 feet, not the full 90 feet? Correct. Your Honor, thank you very much. Hi, it's Tom Waldo again for the appellants. And as an initial matter, I would like to answer the question that Judge Hugg asked, that Mr. Berghoff wasn't certain about, and that is the timing of the construction of the dam. Before the permit was reinstated on March 29th, they didn't have a permit to put any fill material into the wetlands there. And so there was no construction taking place at that time. That construction had to have taken place after March 29th when the permit was reinstated. But let me turn to the substance of the motion to vacate. Obviously, the plaintiffs don't want to see that temporary dam fail, as described by CORE Alaska. I think all of the parties share a common goal here. CORE now concedes that the injunction provides ample authority to take measures that are needed to control any erosion or site stability problems. Do you agree that there is a danger due to weather that the temporary cofferdam might fail? We don't have any reason to doubt that that's true. All that we know about it is what they've said in their motion, and they haven't even provided an affidavit of an engineer or anything like that or any documentation of the situation as it exists up there. So everything we know about it essentially is what we've seen in their motion. But we don't have reason to doubt that. It is possible that if you were to have particularly adverse weather conditions where you had a lot of snow combined with a lot of snow melt all at once, that it could pose some kind of threat to that temporary dam. Assuming there is some probability of some kind of threat, what is your position on what the proper remedy for that is, short from vacating the injunction? It's something that we need to work more on. As Mr. Burghoff pointed out, it's been difficult to get out to the site, and it's all covered in snow right now. But from the conversations that we've had with engineers, it should be possible just to put in a spillway that would take care of any overflow and address the problem without going to the extreme measure of building the entire 38-foot dam they want to build. One thing that's not clear to me, I'm just trying to picture it, is it now damming up some part of the flow of the creek into that lake? I thought it was going around. There are two dams, and that might be the source of the confusion here. There's one above the lake that is diverting the stream water around the lake into the stream below the lake. There's another dam at the outfall of the lake itself that is supposed to be preventing the area in which they want to construct the big permanent dam from getting any stream flow or anything onto it. But there's no water being fed into the lake, right? Oh, that's correct. Yeah, there's no water except for runoff that just occurs from the area around the lake. The stream is not flowing into the lake right now. But the coffer dam is at the lower end of the lake. I believe that. My understanding is that's the dam they're talking about. Yes, the one at the lower end of the lake. If that dam fails, there would be a possibility of some, you'd call it generally, pollution into the creek, right? Yeah, there'd be some bad runoff from that. It would not be a good situation. We agree that you want to avoid that. As I say, our understanding of the facts as best we can determine them at this time is that you could solve it with much less drastic measures than building the whole permanent dam. What? Well, like just putting in a spillway. You'd dig out, put in a 36-inch pipe that could let water flow out if the water level were to rise in the lake. By a spillway, you mean it would go through the dam? Yeah, you'd have to excavate and put it in there. That's right, and we've been told that that's sort of a reasonable measure to deal with that. But this is candidly a pretty preliminary assessment based on not really knowing all the facts and not seeing everything out there. My understanding right now is that there's no water actually pushing against that temporary dam because they brought the level of the lake down so much. By diverting all that water around it, by pumping water out of the lake, the water level in the lake is actually quite low, and so it would actually take a lot of snow melt combined with a lot of rain to create enough extra water to cause a problem there. But another thing that's really important to be aware of here is that I'm told that ... Well, first of all, be aware that the injunction applies to not only core Alaska but also to the Forest Service and the Corps of Engineers who have jurisdiction over the site up there. My understanding is that neither the Corps of Engineers nor the Forest Service has taken any position on what, if any, measures are needed to deal with the issues of the temporary dam up there. We think that the best way to proceed with this is for core Alaska to work with the agencies that have jurisdiction on the site and with the plaintiffs to determine the best method, the appropriate method allowed by the injunction to avoid any potential problems up there. If the parties can't agree or if there's some uncertainty about what the injunction would allow, you can deal with that issue through a separate motion, through a motion that's focused on the particular dispute. At this point, it's unnecessary to resolve that. It's premature to resolve that. There needs to be more work among the parties, including the agencies with jurisdiction, to authorize whatever it is the Corps wants to do. We think that's the best way to do it. As to core Alaska's point about being concerned about the uncertainty and not knowing what the injunction authorizes, it's going too far to vacate the whole injunction just to deal with some unspecified uncertainty. The better approach is to determine what measures are best to take first among all the parties, and then only if there's some uncertainty or dispute about that, then deal with a more narrow and focused motion and not just throw out the whole injunction. All right. Thank you, Counsel. Thank you. We'll give you a moment to respond. Is it true that the lake is being drawn down? The lake has been drawn down, Your Honor. That is accurate. The easiest, most straightforward approach here is simply to lift the injunction. I wish that I was an engineer and could speak with that expertise, but I'm just a poor lawyer and my expertise is limited. But we did offer the affidavits, particularly of Mr. Wilder, and it's not as if we're just flying blind here. We have a site-approved engineering plan to go forward. There is nothing in that plan that is irretrievable, unreclaimable. But there is an agreed potential problem of stability moving forward, and the easiest way to deal with that would be to lift the injunction, and that is what we are asking the court to do. But the whole problem is with regard to that. The whole concern you have is with regard to that 10-foot dam. Yes, at this stage, that's true, Your Honor. And keep in mind, when I said it hardly deserves the term dam, this is pervious dirt. That's all it is. And what we would be putting in is an earthen dam with lifts of specific kind of earthen material. It's just an entirely different situation. Just push a 10-foot-high dirt, does that extend for the full 500 feet that the dam is broke? No, it's actually quite limited at the base of the lake. I would say significantly less than 500 feet at this stage of the game. It looks more like a roadway just at the base of the lake, and it looks like kind of the dams I put in my backyard sometimes to stop the flow of water that are quickly taken care of by water. Okay. Thank you, Your Honor. All right. Thank you, Counselor. Thank you, Judge Lee. I'd like to ask Mr. Starr a question. Have the involved agencies taken any position on the likelihood of the failure of the cofferdam? No, they haven't, Your Honor. There's been no proposal of any kind. Have they made an examination of the dam? My understanding is they also were trying to get a site visit up there, and I don't know whether that's happened yet or not in light of weather conditions. But as far as the information you have, the agencies haven't come to any conclusion. That's correct, Your Honor. Thank you. Okay. Thank you, Counselor. That part of the matter before us, that is the injunction part, is also submitted, and the court will be in adjournment.
judges: Hug, Tashima, Graber